UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,   21 cr. 249 (SHS)

 - against -

DuVAUGHN WILSON

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**SENTENCING MEMORANDUM**

            D. ANDREW MARSHALL, ESQ. PC.
              Attorney for Defendant
               DuVAUGHN WILSON
             225 Broadway, Suite 1405
             New York, New York 10007
               (212) 571-3030 ph
               (212) 571-1441fax
            Marshall.law4@verizon.net  email
             By: D. Andrew Marshall, Esq.
              Marlon G. Kirton, Esq.

# D. ANDREW MARSHALL, ESQ., PC

Attorney At Law
225 Broadway, Suite 1405
New York, New York 10007
(212) 571-3030 (office)
(212) 571-1441 (facsimile)
marshall.law4@verizon.net

---

October 3, 2022

*Via ECF*
Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Jill Spitalieri
USPO
Jill_Spitalieri@nysp.uscourts.gov

Ashley C. Nicolas
1 Saint Andrews Plaza
New York, NY 10001
ashley.nicolas2@usdoj.gov

Matthew J. King
matthew.king2@usdoj.gov

**Re:  United States v. DuVaughn Wilson, (S4) 21 Cr. 249 (SHS)**

Dear Judge Stein:

      I represent Mr. Wilson in the above-referenced matter. I request that this Court impose a non-Guideline sentence pursuant to the Court's authority under United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) and 18 USC §3553.

      **I.    Background/Guilty Plea.**

      On June 17, 2022, before this Court, DuVaughn Wilson pleaded guilty to **Count 1** of the superseding indictment charging him with Firearms Trafficking Conspiracy in violation of 18 USC § 371 (Class D Felony). He is exposed to not more than 5 years imprisonment and not more than 3 years of supervised release. He is exposed to up to $250,000 in fines and a $100 special assessment. He also pleaded guilty to **Count 2**: Firearms Trafficking in violation of 18 USC §§ 922(a)(1)(A) (Class D Felony). He is exposed to not more than 5 years imprisonment and not more than 3 years supervised release. The maximum term of imprisonment on Counts One and

Two is ten years. He is exposed to a $250,000 fine and a $100 special assessment.

Additionally, he admitted to the forfeiture allegation with respect to Count One of the information. Pursuant to Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c).

### II.   United States Sentencing Guidelines Calculation/Pre-sentence Investigation Report (PSR).

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("USSG" or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

1. The November 1, 2021, edition of the Guidelines manual is applicable to this case.
2. Pursuant to USSG § 3D1.2(d), Counts One and Two are grouped together because the offense level is determined largely based on aggregate harm.

3. Pursuant to USSG § 2K2.1(a)(7), the base offense level is 12.

4. Pursuant to USSG § 2K2.1(b)(1)(C), a six-level enhancement applies because the offenses charged in Counts One and Two involved between 25 and 99 firearms.

5. Pursuant to USSG § 2K2.1(b)(5), a four-level enhancement applies because the defendant engaged in the trafficking of firearms.

6. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct before the imposition of sentence, a two-level reduction will be warranted, pursuant to USSG § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to USSG § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

**In accordance with the foregoing calculations, the applicable offense level is 19**.

B. Criminal History Category

Based upon the information available to this Office (including representations by the Defense, the defendant has zero criminal history points. **Accordingly, the defendant's Criminal History Category is I.**

C. Sentencing Range

3

Based on the calculations above, the defendant's stipulated Guidelines range is 30 to 37 months imprisonment (the "Stipulated Guidelines Range").

In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to USSG § 5E1.2.

Guidelines level 19's applicable fine range is $10,000 to $100,000.
As per the plea agreement, The parties agree, *inter alia*, that neither a downward nor an upward departure from the Stipulated Guidelines Range is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that are not set forth herein. Nor will either party suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines. The parties agree that either party may seek a sentence outside the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

It is further stipulated that for purposes of this Agreement, the Government agrees not to seek an upward departure from the Stipulated Guidelines Range pursuant to that application note; however, the Government may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

It is understood that pursuant to USSG § 6B1.4(d), the above Guidelines stipulation binds neither the Probation Office nor the Court, either as to questions of fact or the determination of the proper Guidelines to apply to the facts. If the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court.

### III.    Objection to Imposition to Guideline Sentence.

Although the sentencing guidelines are no longer mandatory, the Court is nevertheless required to consider the Guideline range and render a guideline analysis before making its ultimate sentencing decision. *See* United States v. Booker, 534 US 220, 245-246.[1]

The PSR recommended a base offense level of 19, which is based upon information provided to the probation officer by the Government, to wit, the stipulated plea agreement.

In this case, the PSR provides a Guideline analysis, resulting in a sentence of 30 to 37

---

[1] After Booker, a sentencing court may impose a sentence other than that recommended by the Guidelines if, at its discretion, the sentencing court finds that the mitigating factors delineated in 18 USC §3553(a) have been satisfied, warranting a non-guideline sentence.

4

months imprisonment. Such a sentence should not be imposed because the imposition of such a sentence is unreasonable in light of the factors enumerated in 18 USC §3553(a) and articulately listed in the PSR. Based upon examination of the discovery with and co-counsel, Defendant, after consultation, does not contest the assertions outlined in paragraphs 11-107 of the PSR.

### IV.     The Defendant's Background.

DuVaughn Dupree Wilson was born on February 20, 1989, in New York, New York, to the union of Darren Garnier and Sylvia Wilson in West Harlem, City, County, and State of New York. He has two half-siblings, with whom, like his father, he has no relation. According to Mr. Wilson, in retrospect, his parent's relationship was borne out of their co-dependency concerning controlled substances, to cocaine. The defendant has no independent recollection of a relationship with his father. He has only heard stories of him being around during infancy and thereafter "meeting" a few times during his youth. When asked, the one time he recalls seeing his father was a fortuitous occasion when his mother pointed him "laid out in the street," ostensibly highly intoxicated by his drug of choice. The deprivation of those filial needs and the Dickensian abuse he suffered under his mother undoubtedly set Mr. Wilson on the path we are loathed but must confront in this forum.

The defendant has a clear and present recollection of his abusive, dysfunctional deleterious relationship with his mother. As stated above, his mother was also a cocaine addict. He knows that because he was prematurely born addicted to cocaine. As a result, he was in intensive care for 6 months. When he was discharged from the hospital, he was placed in the care of his maternal grandmother. It was until he turned 2 years old that his maternal grandmother relinquished custody back to his birth mother. When asked, Mr. Wilson struggled to recall pleasant moments as a youth living under his mother's care. In response to the question, after a reflection, he said, "I'll get back to you on that." However, when asked about his youth in general, he can vividly recount episodes, series, and patterns of abuse and neglect by his mother that shock the conscious. It also explains but does not excuse the conduct to which he has to plead guilty.

By Mr. Wilson's accounts, his mother was extreme with corporal punishment. As per the PSR, the corporal punishment visited upon Mr. Wilson was as gratuitous as it was random. According to Wilson, she would "beat me with anything she could get her hands on," including belts, cords, tennis rackets, and shoes. The abuse left bruises and welts in areas that were not visible to the public, so his teachers never noticed. I submit that he never mentioned it either for fear of further reprisals. The abuse was compounded by inadequate food, clothing, and comforts of home, which was compromised in favor of his mother's appetite for cocaine. Mr. Wilson admits to having run away from home at least four times.

His hospitalization further exacerbated the absentee father's physical abuse and neglect at 9. According to Mr. Wilson, he had an "episode," and his mother admitted him to the Mount Sinai Medical Center Psychiatric Center. He was then told that his mother gave up her parental rights because she "could not handle me anymore." He recalls being there for approximately six weeks. He recalls being diagnosed with ADHD and being prescribed Ritalin. He remembers that Ritalin made him feel like a zombie. When he was discharged from the hospital, he was

transferred to The Children's Village, a therapeutic residential treatment facility and school for troubled children in Dobbs Ferry, New York. The abuse he experienced at home followed him to The Children's Village. While at the Children's Village, other residents physically and sexually violated Wilson. He was, among other things, assaulted with a baseball bat and raped on two occasions. The culprits were never brought to account for their acts, and he was not provided any care or counseling. The Children's Village staff
"swept it under the rug and moved me to a different unit." He was a resident there until he was approximately 15 years old. He recalls coming home to live with his mother, but, according to Mr. Wilson, his mother concluded that he "was not ready," He went back to The Children's Village until he was 17 years old when he resumed living with his mother. At the time of this submission, the records from the Children's Village have not been made available; therefore, it is unknown what verifiable therapy Mr. Wilson received regarding his early childhood trauma. Mr. Wilson has no clear recollection of anything remotely consistent with psychological or psychiatric treatment or counseling outside Mount Sinai Hospital.

The therapy and counseling would have perhaps prepared and helped him better navigate experiences visited upon him by his mother. Once, he recommended living with his mother. His mother was still drug dependent and financially irresponsible. Unbeknownst to Mr. Wilson, his mother secretly stole his monthly SSI check associated with his ADHD diagnosis. Additionally, she forced him to work and tender all his money to her, allegedly to pay the bills around the house. Aiming to please his abuser, he reluctantly but invariably gave her all of his earnings. Mr. Wilson intercepted the mail and learned that he was receiving an SSI subsidy and that they were being evicted because his mother was not paying the rent. At 18 years old, Mr. Wilson mustered the courage to confront his mother and began to take charge of his life to a degree. He made himself the head of the household and the sole recipient of his SSI subsidy. Through hard work and perseverance, he salvaged their relationship with the landlord and managed to get them out of arrears. Throughout his young adulthood, he recalls his mother openly using drugs in the house. Ultimately, his mother's lifestyle, coupled with his desire to seek a better life for himself, pushed him to seek refuge in Georgia.

Mr. Wilson moved to Georgia with his life partner Ms. Kenya G. They have been together since 2016 when they met at one of his many jobs. They have one child together, aged three years old. He describes their relationship as very close and co-dependent. They share parental and financial responsibilities. Regarding the future, the defendant hopes to be promoted to warehouse manager at his current employment, get married, and buy a home for his family.

As the head of the household, Mr. Wilson avers that his family would be emotionally and financially devastated if he were incarcerated. "They just won't make it without me."

But for his susceptibility to the strong-willed, like his mother, and his need to please others, like his mother, Mr. Wilson's life in Georgia had the potential to have a cheerful ending. Instead, we are now where we have to fashion a sentence that is sufficient but not more than necessary to achieve justice.

**Substance Abuse/Alcohol**

Mr. Wilson does not have any known substance abuse issues. He does occasionally use alcohol. However, since his arrest, he has ceased using marijuana, his former drug.

### Educational, Vocational, and Special Skills

Mr. Wilson attended school at the Children's Village. He has not produced any evidence indicating that he earned either a high school diploma or a GED. However, he explained that he graduated high school but could not pass the Regent's Exam; therefore, he never received his diploma. Additionally, he stated that he enrolled in Abyssinian Baptist Church (ABC) Youthbuild, where he received vocational training in construction and studied for the GED in 2011 but failed the exam. Mr. Wilson admits to educational deficiencies. After all, he had to teach himself because his mother was unavailable due to her drug addiction.

### Medical Health

As per Mr. Wilson, he has ADHD and ADD, is diagnosed with Asthma, and is allergic to shellfish. Medical charts are unavailable; therefore, these representations cannot be verified now.

### Family Composition

Mr. Wilson lives in GA with his life partner Ms. Kenya Gand, and their three-year-old child.

### Employment History

Mr. Wilson has an impressive post-prison employment history. His employment history is as follows: Animal General Hospital, porter, 2006-2010; Gristedes Supermarket, porter, 2010-2011; PCI Industries, milling/asphalt repair, 2011-2019; and; Total Maintenance Solutions, LLC, Mount Sinai Beth Israel, Union Square, environmental services, housekeeping (Local 32BJ), 2020 to present.

### Analysis

As evidenced by the indictment, Mr. Wilson, like many other, similarly situated men who come before this Court charged with two serious felony offenses, is the product of a highly dysfunctional and foreboding environment thinking it was normal. Additionally, Mr. Wilson, like so many other young men who over-crowd the federal correctional institutions, among other things, failed to thrive in or remotely connect with the educational institutions that he attended. The de facto absentee father and abandonment issues have assuredly influenced, if not dictated, the pattern of poor judgment he has demonstrated during his youth and mid-life. Although the Guidelines prohibit this Court from considering what may reasonably be deemed the underlying causes of Mr. Wilson's decision-making, it seems unconscionable that a court could impose any period of incarceration without first considering his characteristics and "real world" circumstances. *See* Rita v. the United States, Docket No. 06-5754. Failure to accurately account for the factors that influenced his life or path to criminal conduct in need of correction, as

mandated by 18 USC 3553, results in an unreasonable sentence. Therefore, the absentee father and abandonment issues surrounding Mr. Wilson, which relate directly to his lack of good judgment and commission of the charged crimes, should be considered along with any other factor or factors this Court deems necessary and proper.

**V.      Impact of *Booker* and *Fanfan*.**

In United States v. Booker, 534 US 220 (2005), the Supreme Court held that Blakey v. Washington, 124 S.Ct. 2531 (2004) applied to the Federal Sentencing Guidelines and that the Sixth Amendment right to a jury trial prevented judges from finding facts that enhanced a sentence beyond an applicable statutory maximum. As a remedy, the Supreme Court excised the provisions of the Sentencing Reform Act of 1984, including 18 USC §3553(b) which made the Federal Sentencing Guidelines mandatory. Before Booker, sentencing within the applicable guideline range was mandated under 18 USC §3553(b) unless the sentencing court found an aggravating or mitigating circumstance of a kind or to a degree not adequately considered by the sentencing Commission in the formulation of the applicable guideline. *See* Koon v. United States, 518 US 81, 92-93 (1996) (citing 18 USC §3553(b)).

Over the years, this rule was strictly enforced upon the district courts. *See*, e.g., United States v. Bonnet-Grullon, 212 F.3d 692, 700 (2d Cir. 2000); United States v. Koczuk, 252 F.3d 91, 98 (2d Cir. 2001). However, by finding 18 USC §3553(b) unconstitutional and excising it, the Supreme Court also eliminated the empowering statutory provision, which necessitated the finding of a departure as the only basis upon which to sentence a defendant outside of an applicable sentence range. When the Supreme Court excised the mandatory application of the federal sentencing guidelines, it also eliminated the concept and the mandatory application of the federal sentencing guideline. Instead, the Court held that the sentencing judge may still consider the guideline range as stated in 18 USC §3553(a)(4) & (5), but that the sentencing judge must now also consider the other sentencing factors outlined in 18 USC §3553(a). In the post-Booker era, a sentencing judge must treat the guidelines as just one of many factors. *See* United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

18 USC §3553(a) directs a sentencing court to consider seven statutory factors, among them are: **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant; **(3)** the kinds of sentences available; **(4)** the kinds of sentence and the sentencing range established for--**(A)** the applicable category of offense committed by the applicable category of defendant as outlined in the guidelines…; **(5)** any pertinent policy statement…; **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and **(7)** the need to provide restitution to any victims of the offense. In the absence of the mandatory provisions, which resulted in the mechanical adherence to the sentencing guidelines:

> [n]o limitation shall be placed on the information
> concerning the background, character, and conduct
> of a person convicted of an offense which a court
> of the United States may receive and consider for

the purpose of imposing a sentence.

*See* 18 USC §3661.

The directives of Booker and 18 U.S.C.§ 3553(a) make clear that the Court must now consider all seven (7) sentencing factors. The Guideline sentence, however, prohibits consideration of many of DuVaughn Wilson's characteristics, including lack of guidance as a youth (Guideline §5H1.12) explicitly; in this case, the heightened Guideline sentence is driven by the emphasis on an unsubstantiated amount of crack cocaine attributed to Mr. Wilson, to the exclusion of other factors which, upon close review and insight, relating to the commission of the crime.

Whereas the Guidelines expressly decline to consider these personal characteristics, the Guideline sentence is not, and cannot, be deemed "reasonable' under 18 USC §3553(a) and must be rejected. *See* Rita v. United States, Docket No. 06-5754 at pages 20-21. This issue, not raised by the defendant in Rita v. United States, Docket 06-5754, and therefore not considered by the Supreme Court in its recent decision, is raised here by Kevin Wilson.

**VI. The Imposition of a Non-Guideline Sentence is Warranted.**

In this case, the application of a Guidelines sentence will result in the imposition of an unreasonable sentence. This is true as far as the Guidelines sentence fails to fulfill the Congressional mandate that requires the Court to consider the background, personal character, and conduct of an offender without limitation. As stated above, under 18 USC §3553(a) (1), a sentencing court must consider the "history and characteristics of the defendant."  Under the Guidelines, sentencing courts are forbidden to consider the lack of youthful guidance and other similar circumstances. See Guidelines §5H1.12.

In the post-Booker era, the Court may now consider factors that may not rise to a level warranting a downward departure from the Court's Guidelines analysis. However, when considered with other factors, it may combine to warrant a non-Guidelines sentence under 18 USC § 3553(1). This includes the impact of "Risk and Protective Factors."[2] The absence of protective factors or the presence of risk factors may undoubtedly contribute to juvenile delinquency and, ultimately, criminal conduct and, thus, represent valid and important factors for consideration when deciding on an appropriate sentence. Additionally, these factors are incorporated into 18 USC §3553(a) (1) and 18 USC §3661. Finally, although a proliferation of information on the Risk and Protective Factors exists, this insightful information is rarely, if ever, considered in the sentencing analysis of a Pre-sentence Report. Such is the case with respect to DuVaughn Wilson.

In the case at bar, this Court can impose a meaningful sentence without resorting to the guideline imprisonment range, which is indeed "sufficient, but not greater than necessary to" to afford adequate deterrence and to protect the public from DuVaughn Wilson's future criminal conduct.

**VII. Defendant's Role in the Offense**

The Government filed a letter dated August 24, 2022, discussing the relative culpability of each of the Defendants.[3] Mr. Wilson was grouped in Tier 1 with Mr. Thomas and Mr. Schloss. The Defense disagrees with this assessment.

Mr. Wilson has zero criminal history points, whereas Mr. Thomas and Mr. Schloss have prior felony convictions. Mr. Wilson does not have a leadership enhancement, unlike the other two defendants in Tier 1. Mr. Wilson was not aware of the entire scope of the conspiracy. Mr. Wilson did not "profit" from the conspiracy. The other two defendants were in charge and had a high-level view of who did what, when, and why. Mr. Wilson stopped making straw purchases for others after the ATF gave him a cease-and-desist letter.[4] Mr. Wilson has a Guidelines range of 30-37, tied for the lowest in this Indictment. Mr. Wilson is not charged with obstruction, unlike Mr. Thomas. Mr. Wilson has an extensive work history dating back more than a decade. Mr. Wilson's involvement, in this case, was motivated by financial gain. He understands that his actions were unacceptable.

**VIII. Conclusion.**

As stated above, DuVaughn Wilson was the product of an "abnormal environment thinking it was normal." The dearth of adequate youthful guidance and unfulfilled filial needs has colored Mr. Wilson's world and has laid the foundation for his negative behavior. The paternal abandonment and the serial maternal abuse, neglect, and manipulation have undoubtedly negatively influenced his thoughts and actions. These factors must be considered when the Court decides the appropriate sentence for his criminal conduct in this case.

A Guidelines sentence prohibits the consideration of these all-important factors. To ignore the personal characteristics and circumstances of Mr. Wilson is unreasonable.

Based upon the combination of factors present in the defendant's history and background, along with the kinds of sentences available to the Court, DuVaughn Wilson requests that the Court impose a sentence pursuant to 18 USC §3553(a). Such a sentence is sufficient but not greater than necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes.

Respectfully submitted,

*D. Andrew Marshall*/s/
_____
D. Andrew Marshall

DAM/kw
Cc:   Jill Spitalieri

---

[3] *US PACER Docket Entry No. 221*.
[4] He did make additional purchases for himself after he was given the cease-and-desist order from the ATF. The lawfully purchased firearms were recovered at the time of his arrest.

10

USPO
Jill_Spitalieri@nysp.uscourts.gov

AUSA Ashley C. Nicolas
ashley.nicolas2@usdoj.gov

AUSA Matthew J. King
matthew.king2@usdoj.gov